Benjamin J. Miller (*pro hac vice*)
HIGGINS FIRM PLLC
524 4th Ave. S.
Nashville, TN 37210
Telephone: (615) 353-0930
Facsimile: (888) 210-5883
E-mail: ben@higginsfirm.com

*Attorney for Plaintiff and the Proposed Class*
[additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| POLLY NELSON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BRAIN STATE TECHNOLOGIES, LLC, BRAINTELLECT, LLC, and LEE GERDES,<br><br>Defendants. | Case No.  2:16-cv-01457-SPL<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

**INTRODUCTION**

1. This case is about a scheme to sell phony business opportunities, disguised as "licenses," worth little more than the paper they were printed on. Unbeknownst to the purchasers of these licenses, what they were really buying was the right to pay tens or hundreds of thousands of dollars with no realistic possibility of recouping even a fraction of their investment. This failure to disclose material facts violated the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 *et seq.*

2. As a result of the scheme, Defendants have taken millions of dollars from unsuspecting people hoping to improve their lives by operating independent, successful businesses.

3. Defendants Brain State Technologies, LLC, Braintellect, LLC, and Lee Gerdes (together, "Brain State") market devices and processes purporting to balance and harmonize brain waves, thereby alleviating a variety of psychological problems. Brain State sells business arrangements, labeled as "licensing agreements," to Plaintiff and others ("Purchasers") who want to operate businesses selling the brain harmonization services to consumers. Under the contracts, Brain State provides hardware, software, and training to enable the Purchasers to operate their own brain assessment businesses.

4. Purchasers pay approximately $25,000-$40,000 for an initial license, and tens of thousands of dollars more in costs and fees required to operate the brain assessment businesses, but not disclosed at the time of contracting. There is no realistic possibility of recovering sufficient revenue to recoup these investments, in part because the market for brain harmonization services is miniscule. No reasonable person would purchase a Brain State license if provided material information Brain State did not disclose, including but not limited to the total costs of operating a brain assessment business and the near impossibility of realizing any profits from the operation of such a business.

5. Brain State could have disclosed all material information to its Purchasers by complying with the Federal Trade Commission's ("FTC") rules regulating the sale of franchises. Those rules require extensive disclosures to protect franchisees from exactly the sort of

1  undisclosed risks and unsound investments at issue here. Brain State knew of the FTC
2  regulations; as part of its scheme, it attempted to evade FTC oversight and FTC disclosure
3  guidelines by including language in its licensing agreements purporting to exempt the agreements
4  from those regulations by falsely calling them "licenses."

5      6. Alternatively, Brain State's sales of licenses violated Arizona's business
6  opportunities law, which requires anyone who sells or leases a business opportunity to register
7  with the State and make certain written disclosures before the sale. Ariz. Rev. Stat. §§ 44-
8  1271(1)(a), 44-1271.01, 44-1276. Because Brain State failed to register as a business opportunity
9  seller and provide the required disclosures, the Purchasers are entitled to rescission of their
10 agreements and refund of all monies paid.

11     7. Finally, Defendant Lee Gerdes, the founder and CEO of Brain State Technologies
12 and Braintellect, violated the Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. § 1961
13 *et seq*, by operating his businesses through a pattern of racketeering. Specifically, Brain State
14 perpetrated a scheme to defraud Plaintiff and other Purchasers by selling unprofitable Brain State
15 business opportunities while concealing facts material to the transactions. This scheme was
16 accomplished in part by transmitting, through the mails and wires, communications such as the
17 licensing agreements, demands for payment, Brain State's website, and other materials. At all
18 relevant times, Gerdes controlled the operations of both Brain State entities and was responsible
19 for the content of the licensing agreements.

20 **PARTIES**

21     8. Plaintiff Polly Nelson is an individual residing in Williamson County, TN.
22    9. Defendant Brain State Technologies, LLC is an Arizona limited liability company
23 with its principal place of business at 15150 N. Hayden Road, Suite 106, Scottsdale, AZ 85260.
24    10. Defendant Braintellect, LLC is an Arizona limited liability company with its
25 principal place of business at 15150 N. Hayden Road, Suite 106, Scottsdale, AZ 85260.
26 Braintellect, LLC is a subsidiary of Brain State Technologies.
27    11. Defendant Lee Gerdes is a resident of Arizona. Gerdes is the founder and CEO of
28 Brain State Technologies, LLC and Braintellect, LLC.

**JURISDICTION**

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action, filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and the Named Plaintiff, Class Members, and Defendants are citizens of different States. This Court also has subject matter jurisdiction over Plaintiff's and the proposed Class' RICO claims under 28 U.S.C. § 1331, and subject matter jurisdiction over Plaintiff's and the proposed Class' state-law claims under 28 U.S.C. § 1367(a).

13. Venue is proper in this Court pursuant to 28 U.S. C. § 1391, because Defendants reside in this District. Venue is also appropriate in this district because the contracts at issue contain forum selection clauses providing for venue in this District. *See* Ex. A (12/9/08 Agreement) at ¶ 17; Ex. B (6/1/11 Agreement) at ¶ 18.

**BACKGROUND**

**A.   Brain State's Licensing Scheme**

14. Brain State Technologies markets devices and processes purporting to balance and harmonize brain waves, alleviating a variety of psychological problems. The technology is comprised of non-invasive sensors that relay brainwaves at extremely high-resolution levels to computer software that produces an acoustic mirror of brain activity in real time, engineered sound envelopes to enhance the resonant mirroring process, and natural ambient sounds to help the brain perpetuate and sustain results.

15. Brain State Technologies provides its hardware and software to individuals and businesses in exchange for money, permitting them to operate their own brain optimization businesses pursuant to written agreements. The Brain State agreements are termed "non exclusive license agreements" and provide that they shall not be construed as creating a partnership, joint venture or agency relationship or as granting a franchise as defined in 16 C.F.R. § 436.2(a) or any similar laws in other jurisdictions.

16. Defendant Gerdes signed the agreements for Brain State Technologies, LLC.

17. Agreements sometimes extend for a fixed period, such as three years, and sometimes continue until terminated. Under the agreements, Purchasers must pay a one-time fee ranging approximately from $25,000 to $40,000, plus ongoing fees of approximately $500 to $750 per month.

18. There are additional costs to running a brain optimization business, costs that are not disclosed in the licensing agreements, which state only that Purchasers will have the "opportunity" to buy other equipment and supplies. For example, Purchasers are required to pay additional fees for "education" and other products. The extra payments are made primarily to Defendant Braintellect.

19. In exchange for these substantial fees, Brain State Technologies agrees to provide Purchasers with hardware, software, and ongoing telephone and email service and support.

20. Purchasers are required to provide Brain State with client data, on a monthly basis, to permit Brain State to evaluate its products and develop new products. The data that Purchasers are required to provide includes copies of all assessments taken, the subjective analysis of each client, copies of all brain harmonization sessions recorded, a list of all clients and Brain State achievements, and any additional information reasonably requested by Brain State.

21. Purchasers must agree to complete training provided by Brain State.

22. Brain State permits Purchasers to indicate in marketing materials or otherwise that they are an affiliate of Brain State. Purchasers may also use Brain State's trademarks in any document, literature, or Purchaser website. Brain State promises to update affiliate symbols and language so that Purchasers may update their affiliation promotion.

23. Despite the substantial upfront and continuing costs of operating a Brain State license, there is no reasonable likelihood of a Purchaser operating their business at a profit, in part because the market is virtually nonexistent relative to the substantial investment required. Instead, Purchasers typically send more money to Brain State in the hope of jumpstarting their failing businesses.

**B.      Brain State's Failure to Disclose Material Facts**

24.     When selling a business opportunity—whether termed a "license," a "franchise," or something else—sellers must disclose material facts to enable prospective buyers to make an informed decision.  Those material facts generally include, but are not limited to, the nature of the seller and its business operations, the costs to purchase the business opportunity, the contractual terms and conditions under which the business operates, the fees and ongoing expenses related to the operation of the business, the success of the seller and its purchasers, and the seller's financial viability.

25.     This standard of conduct is well-known.  Both the federal government and various States, including Arizona, regulate business opportunity arrangements.

26.     For example, the FTC regulates the sales of "franchises," defined as "any continuing commercial relationship or arrangement whatever it may be called, in which the terms of the offer of contract specify, or the franchise seller promises or represents, orally or in writing, that: (1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark; (2) The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operations; and (3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate." 16 C.F.R. § 436.1(h).

27.     The FTC Amended Franchise Rule, 15 C.F.R. § 436.1 *et seq.*, requires franchisors to furnish potential franchisees a comprehensive and detailed disclosure statement, at least 14 days before the franchisee signs an agreement with or makes any payment to the franchisor.  16 C.F.R. § 436.2(a).

28.     The required disclosures include (1) background information on the franchisor, including the general market for the product or service and description of the competition; (2) business experience of the franchisor's directors and principal officers; (3) any lawsuits involving the franchisor or affiliated entities, including lawsuits against franchisees; (4) any bankruptcies;

(5) initial fees owed to the franchisor; (6) other fees, including recurring or occasional fees associated with operating the franchise; (7) estimated initial investment, including estimated payments to third parties; (8) any restrictions on sources of products and services; (9) the franchisee's obligations, in a prescribed tabular format cross-referenced to the franchise agreement; (10) the material terms and conditions of any financing arrangements; (11) the franchisor's obligations under the agreement to furnish assistance to franchisees; (12) the details of any training programs, including, in a table titled in bold, capital letters, "**TRAINING PROGRAM**," that lists the subject matter, the hours of classroom training on each subject, hours of on-the-job training, and the location of the training; (13) details concerning assigned territories and applicable sales restrictions; (14) the status of any trademarks or other intellectual property; (15) the franchisee's obligation to participate personally in the operation of their franchise; (16) restrictions on what the franchisee may sell; (17) provisions of the agreements dealing with termination, renewal, and dispute resolution; (18) public figures involved in the franchise system; (19) representations about the franchisee's financial performance prospects, or a prescribed statement warning the franchisee that no such representations are made; (20) statistics related to the number of other franchises; (21) contact information for current and former franchisees; and (22) the franchisor's financial statements for the most recent three fiscal years audited in accordance with generally accepted accounting principles.

29. The Rule's disclosure requirements that ensure franchisees understand their financial commitment are particularly strict. Fees must be disclosed in a prescribed tabular format that includes the type of fee, amount of fee, due date, any formula used to compute the fee, and the maximum amount of any potential increase in the fee or the formula used to determine the increase. The estimated initial investment to be disclosed includes not only the fees to be paid to the franchisor but also payments required to be paid to third parties.

30. Also critical are the Rule's disclosure requirements that ensure franchisees understand the potential market for the business they intended to operate. The Rule requires the franchisor to describe the general market for the product or service the franchisee will offer, including a general description of the competition. The Rule requires the franchisor to disclose

the franchisee's exclusive territory, and, if there is no exclusive territory (as with the Brain State licenses), a prescribed statement underscoring that point, and a warning about the consequences of purchasing a non-exclusive territory. If a franchisor elects not to represent the franchisee's financial prospects, the disclosures must contain a prescribed statement making that clear. The Rule requires five tables describing statistical information on the number of franchised outlets and contact information for current and former franchisees. And franchisors must disclose their own audited financial statements, with a table that compares at least two fiscal years so that franchisees can assess the financial status and health of the franchisor.

31. Similarly, Arizona's business opportunities law requires anyone who sells or leases a "business opportunity" costing $500 or more to register with the State and make certain written disclosures before the sale. Ariz. Rev. Stat. §§ 44-1271(1)(a), 44-1271.01, 44-1276.

32. The required disclosures cover the same topics as the FTC regulations do, and require information about the seller, the opportunity being sold, and fees that the purchaser can expect to pay.

33. On information and belief, Brain State was aware that selling a Brain State license without disclosing all material information was improper and violated applicable law. In fact, Brain State attempted to avoid the FTC regulations by fraudulently including in its standard licensing agreement a provision that "this Agreement shall [not] be construed . . . as granting a franchise as defined in 16 CFR Section 436.2(a), or any similar laws in other jurisdictions." *See* Ex. A (12/9/08 Agreement) at ¶ 16; Ex. B (6/1/11 Agreement) at ¶ 17.

34. Nevertheless, Brain State concealed material facts from Plaintiff and other Purchasers, including but not limited to the following:

 a. That Purchasers would be required to pay additional fees to Braintellect to operate their brain assessment businesses;

 b. That the Brain State licenses were essentially worthless, for Purchasers had no realistic possibility of breaking even, let alone making a profit;

 c. That Brain State would control or attempt to control Purchasers in their use of the Brain State technology;

1         d.       That Brain State would impose arbitrary rules on Purchasers;

2         e.       That Brain State's products were potentially illegal under laws regulating health care products;

        f.       That Brain State could not sustain its operations without continuous infusions of capital in the form of Purchaser payments; and

        g.       That Brain State intended to and would compete directly and aggressively with its Purchasers.

**C.**     **Named Plaintiff**

35.     On December 9, 2008, Ms. Nelson entered into a licensing agreement with Brain State Technologies to purchase one license to operate a brain assessment business. The agreement required her to pay, and she did pay, an initial licensing fee of $39,150, and ongoing monthly license fees of $500. *See* Ex. A at 1-12.

36.     On April 13, 2009, Ms. Nelson and Brain State Technologies executed an addendum to the 2008 agreement permitting her to operate an additional brain assessment license. Nelson hoped that the ability to service two brain assessment clients at once might jumpstart her failing business. She agreed to pay, and did pay, an initial license fee of $27,900 and ongoing monthly license fees of $250. *See* Ex. A at 13.

37.     On May 25, 2011, Ms. Nelson, in a desperate attempt to rescue the tens or hundreds of thousands of dollars she had already spent, entered into a second licensing agreement with Brain State Technologies, thinking she could operate a second brain assessment business for children. She agreed to pay, and did pay, an initial license fee of $25,010 and ongoing monthly license fees of $500. *See* Ex. B.

38.     Ms. Nelson made dozens and dozens of payments to Brain State Technologies and Braintellect between 2008 and 2015, including the monthly license fees and additional expenses for consulting, equipment, maintenance, supplies, training, and other items.

39.     Had Ms. Nelson known of the additional fees required to operate a Brain State license, and known the near-zero possibility of realizing a profit from the license, she never

would have entered into the licensing agreements, and would not have paid the initial payments, the ongoing monthly fees, or the additional fees.

40. Among the material facts that Brain State should have disclosed but did not disclose are:

    a. That Brain State intended to and would compete with Ms. Nelson for future business and existing clients.

    b. That Brain State intended to and would sell brain assessment devices directly to consumers, thereby eliminating the market for Purchaser providers.

    c. That Brain State intended to and would exert a significant degree of control over Ms. Nelson's business operations, such as controlling the content of her website.

    d. That Ms. Nelson would be required to purchase from Braintellect, LLC certain equipment and supplies necessary to operate her business.

41. Ms. Nelson terminated all of her licenses effective August 31, 2015.

42. Had Brain State disclosed the facts material to the licensing transactions, Nelson would not have purchased Brain State licenses or paid the additional fees.

43. Ms. Nelson paid Brain State Technologies $182,107.31, none of which she would have paid but for Brain State's material omissions.

44. Ms. Nelson paid $29,499.34 to Braintellect, none of which she would have paid but for Brain State's material omissions.

## STATUTES OF LIMITATION TOLLING

45. Any applicable statutes of limitation have been tolled by Brain State's knowing and active concealment and denial of material facts, which had a duty to disclose those facts.

46. Brain State is estopped from relying on any statutes of limitations because Brain State failed to timely disclose, among other things, the fact that its Purchasers would pay for more in fees than they ever could hope to recover by operating a Brain State license.

47. Plaintiff Nelson, and members of the Class, did not discover Defendants' continuing fraudulent scheme, or the scope of the fraud, and could not have done so with reasonable diligence.

**CLASS ACTION ALLEGATIONS**

48. Plaintiff brings this action on behalf of herself and, under Fed. R. Civ. P. 23(a) and (b)(3), as representatives of the Class defined as follows:

> All individuals or business who entered into "licensing" agreements with Brain State Technologies, LLC., or made payments in connection with those agreements to Brain State Technologies, LLC, Braintellect LLC, or any related person or entity.

49. Plaintiff also brings this action on behalf of herself and, under Fed. R. Civ. P. 23(a) at (b)(3), as representatives of Subclass defined as follows:

> All individuals or business who, on or after August 2, 2012, entered into "licensing" agreements with Brain State Technologies, LLC., or made payments in connection with those agreements to Brain State Technologies, LLC, Braintellect LLC, or any related person or entity.

Excluded from the Class and Subclass are Defendants and their subsidiaries and affiliates, as well as the judicial officers and their staff to whom this case is assigned or referred, and their immediate family members.

50. The members of the Class and Subclass are so numerous that joinder is impracticable because there are, on information and belief, around 200 active Brain State Purchasers, and an unknown number of former Purchasers.

51. This case presents numerous questions of law or fact that are common to all Class members. These questions' answers are central to the validity of Plaintiff's and Class members' claims, and their determination is apt to drive the resolution of the claims. These common questions include:

  a. Whether Brain State failed to disclose material facts when selling Brain State licenses.

  b. Whether Brain State's sale of licenses without disclosing material information violated the Arizona Consumer Fraud Act.

  c. Whether Brain State's licenses are "business opportunities" under Arizona's business opportunities law;

  d. Whether Brain State is a "seller" of a "business opportunity" under Arizona's business opportunities law;

  e. Whether Brain State complied with the registration and disclosure requirements of Arizona's business opportunities law;

  f. Whether Class Members are entitled to a rescission of their licensing agreements and refund of moneys paid to Brain State.

  g. Whether Brain State Technologies, LLC and Braintellect, LLC, together constitute an "enterprise" for the purposes of RICO.

  h. Whether Brain State transmitted licensing agreements, demands for payments, and other materials related to the licensing scheme by means of mail and wire communications travelling in interstate or foreign commerce.

  i. Whether Brain State's transmitting licensing agreements, demands for payments, and other Brain State materials constituted mail or wire fraud.

  j. Whether Gerdes controlled and participated in the activities of the two Brain State corporate entities.

  k. Whether Gerdes conducted and participated in the affairs of a RICO enterprise through a pattern of racketeering activity.

  l. Whether Class members are entitled to damages, either through the Arizona Consumer Fraud Act or RICO.

52. Plaintiff's claims are typical of the claims of those of Class members, as they all arise from the same common course of conduct on the part of Defendants.

53. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff's interests are aligned with and not in conflict with those of Class members. Plaintiff and the Class are represented by counsel with long and deep experience in the prosecution of consumer class actions, and franchise law. Plaintiff's counsel is knowledgeable about the applicable law and possesses the resources to fully commit to representing the Class.

54. Questions of law or fact common to class members predominate over any questions affecting only individual Class members.

55. A class action is superior to other available methods for fairly and efficiently adjudicating these claims.

**FIRST CAUSE OF ACTION**
**ARIZONA CONSUMER FRAUD ACT**
**ARIZ REV. STAT. § 44-1521 *ET SEQ*.**
**AGAINST ALL DEFENDANTS AND ON BEHALF OF THE CLASS**

56. Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

57. The Arizona Consumer Fraud Act prohibits "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged[.]" Ariz. Rev. Stat. § 44-1522.

58. Defendants are "persons" under the Act.

59. The right to operate a brain harmonization license as well as Brain State's hardware and software are all "merchandise" under the Act.

60. Brain State's deceptive sales of licenses and omission of material facts constitute prohibited acts under the Act.

61. Plaintiff and the proposed Class were harmed by Brain State's violations of the Act because they would not have paid licensing fees and other costs to Brain State but for the material misrepresentations and omissions.

62. Material facts omitted by Defendants include:

    a. That Purchasers would be required to pay additional fees to Braintellect to operate their brain assessment businesses;

    b. That the business opportunities were essentially worthless, for Purchasers had no realistic possibility of breaking even, let alone making a profit;

    c. That Brain State would control or attempt to control Purchasers in their use of the Brain State technology;

    d. That Brain State would impose arbitrary rules on Purchasers;

    e. That Brain State's products were potentially illegal under laws regulated health care products;

    f. That Brain State could not sustain its operations without continuous infusions of capital in the form of Purchaser payments; and

    g. That Brain State intended to and would compete directly and aggressively with its Purchasers.

 63. Plaintiff, on behalf of herself and the proposed Class, seeks damages, rescission, and restitution.

## SECOND CAUSE OF ACTION
## ARIZONA BUSINESS OPPORTUNITY LAW
## ARIZ. REV. STAT. § 44-1271 *ET SEQ*.
## AGAINST ALL DEFENDANTS AND ON BEHALF OF THE SUBCLASS

 64. The Second Cause of Action is pleaded in the alternative to the First Cause of Action.

 65. Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

 66. On August 2, 2012, Arizona enacted a law requiring anyone who sells or leases a "business opportunity" costing $500 or more to register with the State and make certain written disclosures before the sale. Ariz. Rev. Stat. §§ 44-1271(1)(a), 44-1271.01, 44-1276.

 67. The definition of a "business opportunity" does not include "[t]he sale of a franchise as defined by the" FTC Amended Franchise Rule. *Id.* § 44-1271(1)(c)(iii).

 68. Defendants are "sellers" and Brain State licenses are "business opportunities," both as defined by the Arizona law.

 69. Because the licensing agreements, drafted by Defendants, state that Brain State licenses are not franchises as defined by the FTC rules, Defendants are estopped from claiming that the licenses are not business opportunities under the Arizona business opportunity law.

 70. Brain State did not comply with the registration and disclosure requirements of the Arizona law.

71. Under the statute, "[n]o . . . sale of a business opportunity or merchandise related to a business opportunity is effective unless" the seller makes certain disclosures. *Id.* § 44-1276(D).

72. Moreover, "[a] consumer may rescind a sale by an unregistered seller at any time" and "[recover] any purchase monies paid to the unregistered sellers, financial damages caused by the unregistered seller and reasonable attorney fees and costs." *Id.* § 44-1279.

73. Plaintiff, on behalf of herself and the proposed Subclass, seek rescission of the license agreements, restitution of all monies paid to Brain State, attorneys' fees, and costs.

### THIRD CAUSE OF ACTION
### RACKETEER INFLUENCED AND CORRUPT PRACTICES ACT
### 18 U.S.C. § 1961 *ET SEQ.*
### AGAINST DEFENDANT LEE GERDES AND ON BEHALF OF THE CLASS

74. Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

75. RICO prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering. 18 U.S.C. § 1692(c).

76. Defendant Gerdes is a "person" within the meaning of 18 U.S.C. § 1961(3).

77. Defendants Brain State Technologies, LLC and Braintellect, LLC together constitute an "association-in-fact" enterprise within the meaning of RICO, and will be referred to as the Brain State RICO Enterprise.

78. The Brain State RICO Enterprise, which engaged in, and whose activities affected, interstate and foreign commerce, is an association-in-fact of corporate entities within the meaning of 18 U.S.C. § 1961(4). The Brain State RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

79. The Brain State RICO Enterprise had a common purpose: to sell Brain State licenses that they could not have sold, and for greater amounts than they otherwise could have recouped, and to receive additional fees they otherwise could not have received, had the material facts relevant to the transactions been disclosed.

80. At all relevant times, the Brain State RICO Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

81. At all relevant times, Gerdes operated, controlled, or managed the Brain State RICO Enterprise, and directly and personally profited from the Brain State RICO Enterprise.

82. Gerdes conducted and participated in the conduct of the affairs of the Brain State RICO Enterprise through a pattern of racketeering activity, beginning at the latest in 2008, and continuing to this day, consisting of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

83. At all relevant times, Gerdes conducted the affairs of the Brain State RICO Enterprise with the common purpose of, among other things: (i) creating and perpetuating the artifice that a Brain State license had any reasonable potential to result in a profitable business and (ii) inducing Purchasers to pay, collectively, millions of dollars to benefit Brain State Technologies, LLC, Braintellect, LLC, and, ultimately, Gerdes, the founder, owner, and CEO of both entities.

84. Gerdes devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communications travelling in interstate or foreign commerce, writing(s), and/or signal(s), including the Brain State websites, the agreements themselves, Brain State hardware, software, and other materials, and demands for payment.

85. At all relevant times, Gerdes, as the founder and CEO of the Brain State operation and signer of the Brain State agreements, was responsible for the content of the agreements and the material omissions within.

86. Each of the licensing agreements, other materials, and demands for payment sent by Brain State to Plaintiff and members of the Class constituted an act of mail or wire fraud, because they were transmitted, by means of mail and wire communications travelling in interstate or foreign commerce, writings or signals, and were part of a scheme to defraud Plaintiff and members of the Class.

87.     For example, Brain State's transmittal of Plaintiff Nelson's initial licensing agreement, subsequent licensing agreement, monthly demands for payment, demands for payments to Braintellect, LLC, and other materials each constituted mail or wire fraud because they were transmitted by means of mail and wire communications travelling in interstate or foreign commerce, and were all instrumental parts of the scheme to induce Nelson to pay money towards an phony investment.

88.     These acts of racketeering spanned at least seven years and are not isolated or long-ago completed events.  There are more than 200 active Brain State licensees and countless former licensees.  Together, these Purchasers have paid millions or tens of millions of dollars to Brain State and, ultimately, to Gerdes.

89.     Moreover, like Plaintiff, each individual Purchaser was obligated to make continuing, monthly payments to Brain State Technologies, LLC.  And also like Plaintiff, many or most Purchasers also made many payments to Braintellect, LLC.

90.     These acts also present a threat of continued racketeering activity for the more than 200 active Purchasers currently making payments to Brain State.

91.     As a result of Gerdes' actions, Plaintiff and members of the Class were injured in their business or property because they paid money they otherwise would not have paid.

92.     Plaintiff seeks treble damages, attorneys' fees, and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief as follows:

1.     This action to be certified as a class action on behalf of the proposed Class and/or Subclass; that the named Plaintiff be appointed as Class Representative; and that counsel below be designed Class Counsel;

2.     Judgment to be entered against all Defendants on all causes of action and damages suffered;

3.     Plaintiff, the Class, and the Subclass be awarded the full, fair, and complete recovery for all causes of action and damages suffered;

4. Plaintiff, the Class, and the Subclass be awarded rescission, damages, treble damages, restitution, attorneys' fees, and costs.

5. Plaintiff, the Class, and the Subclass be awarded all appropriate costs, fees, expenses, and pre-judgment and post-judgment interest, as authorized by law; and

6. Such other relief that the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all questions of fact raised by this Complaint.

Dated: August 9, 2016             Respectfully submitted,


                                  By: /s/ Benjamin J. Miller
                                      Benjamin J. Miller


                                  Benjamin J. Miller (*pro hac vice*)
                                  HIGGINS FIRM PLLC
                                  524 4th Ave. S.
                                  Nashville, TN 37210
                                  Telephone:  (615) 353-0930
                                  Facsimile:  (888) 210-5883
                                  E-mail:  ben@higginsfirm.com

                                  Jonathan D. Selbin (*pro hac vice* anticipated)
                                  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                  250 Hudson Street, 8th Floor
                                  New York, New York  10013-1413
                                  Telephone:  (212) 355-9500
                                  Facsimile:  (212) 355-9592
                                  E-mail: jselbin@lchb.com

                                  Mark P. Chalos (*pro hac vice* anticipated)
                                  Andrew R. Kaufman (*pro hac vice* anticipated)
                                  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                  150 Fourth Avenue North, Suite 1650
                                  Nashville, Tennessee 37219
                                  Telephone:  (615) 313-9000
                                  Facsimile:  (615) 313-9965
                                  E-mail: mchalos@lchb.com
                                  E-mail: akaufman@lchb.com

                                  Roland W. Baggott III (*pro hac vice* anticipated)
                                  BAGGOTT LAW, PLLC
                                  4525 Harding Pike, Suite 105
                                  Nashville, TN 37205
                                  Telephone:  (615) 620-4580
                                  Facsimile:  (615) 620-4581
                                  E-mail:  roland@baggottlaw.com

Curt Clausen (AZ Bar No. 019709)
Michael Stark (AZ Bar No. 005040)
CLAUSEN & WILLIAMSON, PLLC
2999 North 44th Street, Suite 318
Phoenix, AZ 85018
Telephone: (602) 285-4450
Facsimile: (602) 285-4473
E-mail: curt@cwazlaw.com
E-mail: michael@cwazlaw.com

*Attorneys for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

On August 9, 2016, I electronically filed this document through the ECF system, which will send a notice of electronic filing to all counsel of record.

                                           ___*/s/ Benjamin J. Miller*___
                                                     Benjamin J. Miller