1  Benjamin J. Miller *(pro hac vice)*
   HIGGINS FIRM PLLC
2  524 4th Ave. S.
   Nashville, TN 37210
3  Telephone:  (615) 353-0930
   Facsimile:  (888) 210-5883
4  E-mail:  ben@higginsfirm.com

5  *Attorney for Plaintiffs and the Proposed Class*
   [additional counsel listed on signature page]
6

7

8                    UNITED STATES DISTRICT COURT

9                         DISTRICT OF ARIZONA

10

11  POLLY NELSON, DAVID                    Case No.  2:16-cv-01457-SPL
    BRETHAUER, IDEAL BRAIN, LLC,
12  WILLIAM ALLEN DBA WILLIAM              **THIRD AMENDED CLASS ACTION**
    ALLEN, CHt, LLC, and NADINE            **COMPLAINT**
13  MUELLER, on behalf of themselves
    and all others similarly situated,
14
                 Plaintiff,
15
    v.
16
    BRAIN   STATE   TECHNOLOGIES,
17  LLC,  BRAINTELLECT,  LLC,   and
    LEE GERDES,
18
                 Defendants.
19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

1.    This case is about a scheme to sell phony business opportunities, disguised as "licenses," worth little more than the paper they were printed on.  Undisclosed to the purchasers of these "licenses," what they were really buying was the right to pay tens or hundreds of thousands of dollars with no realistic possibility of recouping their investment, let alone earn any reasonable profit.  This failure to disclose material facts violated the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 *et seq*., the Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. § 1961 *et seq*., constituted common law fraud, and unjustly enriched Defendants.

2.    As a result of the scheme, Defendants bilked millions of dollars out of unsuspecting people hoping to improve their lives by operating independent, successful businesses.

3.    Defendants Brain State Technologies, LLC, Braintellect, LLC, and Lee Gerdes (together, "Brain State") market devices and processes purporting to balance and harmonize brain waves, thereby alleviating a variety of health problems.  Brain State sells business arrangements, labeled as "licensing agreements," to Plaintiffs and others ("Purchasers") who want to operate businesses selling the brain harmonization services to consumers.  Under the contracts, Brain State provides hardware, software, and training to enable the Purchasers to operate their own brain assessment businesses.

4.    Purchasers pay approximately $25,000-$40,000 for an initial "license," and tens of thousands of dollars more in costs and fees required to operate the brain assessment businesses, but not disclosed at the time of contracting.  Brain State knew at the time of contracting that there would be no realistic possibility of recovering sufficient revenue to recoup these investments, in part because the market for brain harmonization services is miniscule.  No reasonable person would purchase a Brain State "license" if provided material information Brain State did not disclose, including but not limited to the total costs of operating a brain assessment business and the near impossibility of realizing any profits from the operation of such a business.

5. Brain State could and should have disclosed all material information to its Purchasers. It could have done so by complying with the Federal Trade Commission's ("FTC") Disclosure Requirements and Prohibitions Concerning Franchising (16 C.F.R. § 436.1) regulating the sale of franchises. Those rules require extensive disclosures to protect franchisees from exactly the sort of undisclosed risks and unsound investments at issue here. Brain State knew of the FTC regulations; as part of its scheme, it attempted to evade FTC oversight and FTC disclosure requirements by including language in its agreements purporting to exempt them from those regulations by falsely calling them "licenses."

6. Alternatively, Brain State's sales of "licenses" violated Arizona's business opportunities law, which requires anyone who sells or leases a business opportunity to register with the State and make certain written disclosures before the sale. Ariz. Rev. Stat. §§ 44-1271(1)(a), 44-1271.01, 44-1276. Because Brain State failed to register as a business opportunity seller and provide the required disclosures, the Purchasers are entitled to rescission of their agreements and refund of all monies paid.

7. Finally, Defendants violated the Racketeer Influenced and Corrupt Practices Act, 18 U.S.C. § 1961 *et seq*, by operating enterprises through a pattern of racketeering. Specifically, Brain State perpetrated a scheme to defraud Plaintiffs and other Purchasers by selling unprofitable Brain State business opportunities while concealing facts material to the transactions. This scheme was accomplished in part by transmitting, through the mails and wires, communications such as the agreements, demands for payment, Brain State's website, and other materials.

## PARTIES

### A. Plaintiffs

8. Plaintiff Polly Nelson is an individual residing in Williamson County, TN. She operated a Brain State "license" under the name Nashville Neuro-Training from approximately December 2008 until approximately August 2015.

9. Plaintiff David Brethauer is an individual residing in Chicago, IL. He operated a Brain State "license" under the name Ideal Brain, LLC from approximately January 2013 until approximately November 2015. Ideal Brain, LLC, a limited liability company registered first under Wisconsin law (ID K033821) and later under Illinois law (file number 05418984) was the owner of the "license." Brethauer brings claims on behalf of himself and on behalf of the LLC. All further references to "Brethauer," "Mr. Brethauer," or "David Brethauer" refer to both the person and the LLC.

10. Plaintiff William Allen is an individual residing in Bend, OR. He operated a Brain State "license" from approximately June 2013 until approximately November 2014. Allen operated his "license" under the business name William Allen, CHt, LLC (Oregon registry number 865821-95).

11. Plaintiff Nadine Mueller is an individual residing in Kelowna, British Columbia. She, along with her husband Mike Mueller, operated a Brain State "license" from approximately December 2012 until approximately September 2014.

**B.** **Defendants**

12. Defendant Brain State Technologies, LLC is an Arizona limited liability company with its principal place of business at 15150 N. Hayden Road, Suite 106, Scottsdale, AZ 85260.

13. Defendant Braintellect, LLC is an Arizona limited liability company with its principal place of business at 15150 N. Hayden Road, Suite 106, Scottsdale, AZ 85260. Braintellect, LLC is a subsidiary of Brain State Technologies.

14. Defendant Lee Gerdes is a resident of Arizona. Gerdes is the founder and CEO of Brain State Technologies, LLC and Braintellect, LLC.

## JURISDICTION & VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action, filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount of $5,000,000.00; and the

1  Named Plaintiffs, Class Members, and Defendants are citizens of different States.  This

2  Court also has subject matter jurisdiction over the RICO claims under 28 U.S.C. § 1331,

3  and subject matter jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

4      16.     Venue is proper in this Court pursuant to 28 U.S. C. § 1391, because

5  Defendants reside in this District.  Venue is also appropriate in this District because the

6  "licensing" agreements at issue contain forum selection clauses providing for venue in this

7  District.  *See* Ex. A (Nelson 12/9/08 Agreement) at ¶ 17; Ex. B (Nelson 6/1/11

8  Agreement) at ¶ 18; Ex. C (Brethauer 1/28/13 Agreement) at ¶ 18; Ex. D (Allen 6/4/13

9  Agreement) at ¶ 18; Ex. E (Mueller 12/20/12 Agreement) at ¶ 18.

10                       **BACKGROUND**

11     **A.     Brain State's Licensing Scheme**

12     17.     Brain State Technologies markets devices and processes purporting to

13  balance and harmonize brain waves, alleviating a variety of health problems.  The

14  technology is comprised of non-invasive sensors that relay brainwaves at extremely high-

15  resolution levels to computer software that produces an acoustic mirror of brain activity in

16  real time, engineered sound envelopes to enhance the resonant mirroring process, and

17  natural ambient sounds to help the brain perpetuate and sustain results.

18     18.     Brain State Technologies provides its hardware and software to individuals

19  and businesses in exchange for money, permitting them to operate their own brain

20  optimization businesses pursuant to written agreements.  The Brain State agreements are

21  termed "non exclusive license agreements" and provide that they shall not be construed as

22  creating a partnership, joint venture or agency relationship or as granting a franchise as

23  defined in 16 C.F.R. § 436.2(a) or any similar laws in other jurisdictions.

24     19.     Defendant Gerdes signed the agreements for Brain State Technologies,

25  LLC.

26     20.     Agreements sometimes extend for a fixed period, such as three years, and

27  sometimes continue until terminated.  Under the agreements, Purchasers must pay a one-

28

time fee ranging approximately from $25,000 to $40,000, plus ongoing fees of approximately $500 to $750 per month.

21.     There are additional costs to running a brain optimization business, costs that are not disclosed in the "licensing" agreements, which state only that Purchasers will have the "opportunity" to buy other equipment and supplies.  For example, Purchasers are required to pay additional fees for "consulting" and other products.  The extra payments are made primarily to Defendant Braintellect.

22.     In exchange for these substantial fees, Brain State Technologies agrees to provide Purchasers with hardware, software, and ongoing telephone and email service and support.

23.     Purchasers are required to provide Brain State with client data, on a monthly basis, to permit Brain State to evaluate its products and develop new products.  The data that Purchasers are required to provide includes copies of all assessments taken, the subjective analysis of each client, copies of all brain harmonization sessions recorded, a list of all clients and Brain State achievements, and any additional information reasonably requested by Brain State.

24.     Purchasers must agree to complete training provided by Brain State.

25.     Brain State permits Purchasers to indicate in marketing materials or otherwise that they are an affiliate of Brain State.  Purchasers are granted a license to and may use Brain State's trademarks in any document, literature, or Purchaser website.  Brain State promises to update affiliate symbols and language so that Purchasers may update their affiliation promotion.

26.     Despite the substantial upfront and continuing costs of operating a Brain State "license," there is no reasonable likelihood of a Purchaser operating their business at a reasonable profit, in part because the market is virtually nonexistent relative to the substantial investment required.  Instead, Purchasers typically send more money to Brain State in the hope of jumpstarting their failing businesses.

27.     For example, brain harmonization clients are typically asked to pay $2,000 or more per "treatment" and spend more than a dozen hours in sessions, money and time that few are willing to commit.

**B.     Brain State's Failure to Disclose Material Facts**

28.     When selling a business opportunity—whether termed a "license," a "franchise," or something else—sellers must disclose material facts to enable prospective buyers to make an informed decision.  Those material facts generally include, but are not limited to, the nature of the seller and its business operations, the costs to purchase the business opportunity, the contractual terms and conditions under which the business operates, the fees and ongoing expenses related to the operation of the business, the success of the seller and its purchasers, and the seller's financial viability.

29.     This standard of conduct is well-known.  Both the federal government and various States, including Arizona, regulate business opportunity arrangements.

30.     For example, the FTC regulates the sales of "franchises," defined as "any continuing commercial relationship or arrangement whatever it may be called, in which the terms of the offer of contract specify, or the franchise seller promises or represents, orally or in writing, that: (1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark; (2) The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operations; and (3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate."  16 C.F.R. § 436.1(h).

31.     The FTC Amended Franchise Rule, 15 C.F.R. § 436.1 *et seq.*, requires franchisors to furnish potential franchisees a comprehensive and detailed disclosure statement, at least 14 days before the franchisee signs an agreement with or makes any payment to the franchisor.  16 C.F.R. § 436.2(a).

32.     The required disclosures include (1) background information on the franchisor, including the general market for the product or service and description of the competition; (2) business experience of the franchisor's directors and principal officers; (3) any lawsuits involving the franchisor or affiliated entities, including lawsuits against franchisees; (4) any bankruptcies; (5) initial fees owed to the franchisor; (6) other fees, including recurring or occasional fees associated with operating the franchise; (7) estimated initial investment, including estimated payments to third parties; (8) any restrictions on sources of products and services; (9) the franchisee's obligations, in a prescribed tabular format cross-referenced to the franchise agreement; (10) the material terms and conditions of any financing arrangements; (11) the franchisor's obligations under the agreement to furnish assistance to franchisees; (12) the details of any training programs, including, in a table titled in bold, capital letters, "**TRAINING PROGRAM**," that lists the subject matter, the hours of classroom training on each subject, hours of on-the-job training, and the location of the training; (13) details concerning assigned territories and applicable sales restrictions; (14) the status of any trademarks or other intellectual property; (15) the franchisee's obligation to participate personally in the operation of their franchise; (16) restrictions on what the franchisee may sell; (17) provisions of the agreements dealing with termination, renewal, and dispute resolution; (18) public figures involved in the franchise system; (19) representations about the franchisee's financial performance prospects, or a prescribed statement warning the franchisee that no such representations are made; (20) statistics related to the number of other franchises; (21) contact information for current and former franchisees; and (22) the franchisor's financial statements for the most recent three fiscal years audited in accordance with generally accepted accounting principles.

33.     The Rule's disclosure requirements that ensure franchisees understand their financial commitment are particularly strict.  Fees must be disclosed in a prescribed tabular format that includes the type of fee, amount of fee, due date, any formula used to compute the fee, and the maximum amount of any potential increase in the fee or the

formula used to determine the increase.  The estimated initial investment to be disclosed includes not only the fees to be paid to the franchisor but also payments required to be paid to third parties.

34.     Also critical are the Rule's disclosure requirements ensuring franchisees understand the potential market for the business they intended to operate.  The Rule requires the franchisor to describe the general market for the product or service the franchisee will offer, including a general description of the competition.  The Rule requires the franchisor to disclose the franchisee's exclusive territory, and, if there is no exclusive territory (as with the Brain State licenses), a prescribed statement underscoring that point, and a warning about the consequences of purchasing a non-exclusive territory. If a franchisor elects not to represent the franchisee's financial prospects, the disclosures must contain a prescribed statement making that clear.  The Rule requires five tables describing statistical information on the number of franchised outlets and contact information for current and former franchisees.  And franchisors must disclose their own audited financial statements, with a table that compares at least two fiscal years so that franchisees can assess the financial status and health of the franchisor.

35.     Similarly, Arizona's business opportunities law requires anyone who sells or leases a "business opportunity" costing $500 or more to register with the State and make certain written disclosures before the sale.  Ariz. Rev. Stat. §§ 44-1271(1)(a), 44-1271.01, 44-1276.

36.     The required disclosures cover the same topics as the FTC regulations do, and require information about the seller, the opportunity being sold, and fees that the purchaser can expect to pay.

37.     On information and belief, Brain State was aware that selling a Brain State "license" without disclosing all material information was improper and violated applicable law.  In fact, Brain State attempted to avoid the FTC regulations by fraudulently including in its standard agreement a provision that "this Agreement shall [not] be construed . . . as granting a franchise as defined in 16 CFR Section 436.2(a), or any similar laws in other

jurisdictions." *See* Ex. A (Nelson 12/9/08 Agreement) at ¶ 16; Ex. B (Nelson 6/1/11 Agreement) at ¶ 17; Ex. C (Brethauer 1/28/13 Agreement) at ¶ 17; Ex. D (Allen 6/4/13 Agreement) at ¶ 17; Ex. E (Mueller 12/20/12 Agreement) at ¶ 17.

38.     Nevertheless, Brain State concealed material facts from Plaintiffs and other Purchasers, including but not limited to the following:

a.     That Purchasers would be required to pay additional fees to Braintellect to operate their brain assessment businesses;

b.     That the Brain State "licenses" were essentially worthless, for Purchasers had no realistic possibility of breaking even, let alone making a reasonable profit;

c.     That Brain State would control or attempt to control Purchasers in their use of the Brain State technology;

d.     That Brain State would impose arbitrary rules on Purchasers;

e.     That Brain State could not sustain its operations without continuous infusions of capital in the form of Purchaser payments; and

f.     That Brain State intended to and would compete directly and aggressively with its Purchasers.

39.     Brain State made these material omissions in each agreement provided to Purchasers, and in each subsequent demand for payment.

40.     Brain State's material omissions continue.  To date, Brain State has never made full and fair disclosures of all facts material to the purchase and operation of a Brain State "license."

**C.     <u>Named Plaintiffs' Experiences</u>**

**1.     <u>Polly Nelson</u>**

41.     On December 9, 2008, Ms. Nelson entered into an agreement with Brain State Technologies to purchase one "license" to operate a brain assessment business.  The agreement required her to pay, and she did pay, an initial fee of $39,150, and ongoing monthly fees of $500.  *See* Ex. A at 1-12.

42.     On April 13, 2009, Ms. Nelson and Brain State Technologies executed an addendum to the 2008 agreement permitting her to operate an additional brain assessment "license."  Nelson hoped that the ability to service two brain assessment clients at once might jumpstart her failing business.  She agreed to pay, and did pay, an initial fee of $27,900 and ongoing monthly fees of $250.  *See* Ex. A at 13.

43.     On May 25, 2011, Ms. Nelson, in a desperate attempt to rescue the tens or hundreds of thousands of dollars she had already spent, entered into a third agreement with Brain State Technologies, thinking she could operate a brain assessment business for children.  She agreed to pay, and did pay, an initial fee of $25,010 and ongoing monthly fees of $500.  *See* Ex. B.

44.     Ms. Nelson made dozens and dozens of payments to Brain State Technologies and Braintellect between 2008 and August 2015, including the monthly fees and additional expenses for consulting, equipment, maintenance, supplies, training, and other items.

45.     Had Ms. Nelson known of the additional fees required to operate a Brain State license, and known the near-zero possibility of realizing a reasonable profit from the "license," she never would have entered into the agreements, and would not have paid the initial payments, the ongoing monthly fees, or the additional fees.

46.     Ms. Nelson did not know, and could not have known with reasonable diligence, the facts underlying her claims, including the fact that her Brain State "licenses" never gave her any reasonable probability of operating a successful business. She did not know, and could not have known with reasonable diligence, that her failed business was the result of Brain State's acts and omissions.

47.     Ms. Nelson terminated all of her licenses with Brain State effective August 31, 2015.

48.     Had Brain State disclosed the facts material to the transactions, Ms. Nelson would not have purchased Brain State licenses or paid the additional fees.

49.     Ms. Nelson paid Brain State Technologies $182,107.31, none of which she would have paid but for Brain State's misconduct.

50.     Ms. Nelson paid $29,499.34 to Braintellect, none of which she would have paid but for Brain State's misconduct.

51.     Ms. Nelson timely filed a lawsuit against these Defendants on September 14, 2015 in the United States District Court for Middle District of Tennessee, which was subsequently transferred to this District.

### 2.     David Brethauer

52.     On January 28, 2013, Mr. Brethauer entered into an agreement with Brain State Technologies to purchase two "licenses," one primary and one secondary.  The agreement required him to pay, and he did pay, an upfront payment of $67,500, which covered the initial licensing fees, beginning equipment, training, and monthly licensing fees for the first year.  *See* Ex. C at 1-11.  After the first year ended, the agreement required Mr. Brethauer to pay, and he did pay, on-going monthly fees of $750.

53.     Additionally, Mr. Brethauer made at least three payments to Braintellect for supplies or equipment.

54.     Mr. Brethauer purchased two "licenses" because Brain State encouraged him to do so, explaining that operating two chairs would permit him to service two clients simultaneously, doubling his projected income.

55.     Mr. Brethauer operated his Brain State "license" as The Ideal Brain, LLC in both Mequon, WI, and Chicago, IL.

56.     Mr. Brethauer worked hard to make his business a success, putting in almost three years of effort, hundreds of thousands of dollars in actual costs, and thousands of hours of his own time.

57.     Mr. Brethauer invested more than $250,000 in his business, including payments to Brain State Technologies, payments to Braintellect, commercial rent, and other business expenses.

58.     Over nearly three years, his business income was less than $64,000.

59.     Mr. Brethauer terminated his "licenses" on November 30, 2015.

60.     Had Mr. Brethauer known the near-zero possibility of realizing a profit from the "licenses," he never would have entered into the agreements, and would not have paid the initial payment, the ongoing monthly fees, or the additional fees.

61.     Mr. Brethauer did not know, and could not have known with reasonable diligence, the facts underlying his claims, including that fact that his Brain State "licenses" never gave him any reasonable probability of operating a successful business. He did not know, and could not have known with reasonable diligence, that his failed business was the result of Brain State's misconduct.

62.     Had Brain State disclosed the facts material to the transactions, Mr. Brethauer would not have purchased Brain State "licenses" or paid the additional fees.

63.     Mr. Brethauer paid Brain State Technologies more than $80,000, none of which he would have paid but for Brain State's misconduct.

64.     Mr. Brethauer paid hundreds of dollars to Braintellect, none of which he would have paid but for Brain State's misconduct.

### 3.     William Allen

65.     On June 4, 2013, Mr. Allen entered into an agreement with Brain State Technologies to purchase one "license."  The agreement required him to pay, and he did pay, an upfront payment of $42,500, which covered the initial licensing fees, beginning equipment, training, and monthly licensing fees for the first year.  *See* Ex. D at 1-10.

66.     Mr. Allen also made at least one payment to Braintellect for supplies or equipment.

67.     Mr. Allen worked hard to make his business a success, but found it basically impossible to convince clients to pay for brain harmonization services.

68.     Clients were required to pay $1,500 to $2,000 for 10 sessions requiring 15 hours over a five-day period, an investment of time and money that few clients were willing to make.

69.     Mr. Allen tried giving away free sessions, but clients never returned willing to pay.

70.     Mr. Allen sunk more than $50,000 into his business and made basically no income.

71.     Mr. Allen terminated his Brain State "license" effective October 31, 2014.

72.     Had Mr. Allen known the near-zero possibility of realizing a profit from the "license," he never would have entered into the agreement, and would not have paid the initial payment or the additional fees.

73.     Mr. Allen did not know, and could not have known with reasonable diligence, the facts underlying his claims, including that fact that his Brain State "license" never gave him any reasonable probability of operating a successful business.  He did not know, and could not have known with reasonable diligence, that his failed business was the result of Brain State's misconduct.

74.     Had Brain State disclosed the facts material to the transactions, Mr. Allen would not have purchased Brain State "license" or paid the additional fees.

75.     Mr. Allen paid Brain State Technologies more than $40,000, none of which he would have paid but for Brain State's misconduct.

76.     Mr. Allen paid hundreds of dollars to Braintellect, none of which he would have paid but for Brain State's misconduct.

### 4.     <u>Nadine Mueller</u>

77.     On January 28, 2013, Ms. Mueller, along with her husband Mike Mueller, entered into an agreement with Brain State Technologies to purchase one "license."  The agreement required the Muellers to pay, and they did pay, an upfront payment of $15,500.  Ex. E at 1-11.

78.     The agreement also required the Muellers to pay, and they did pay, ongoing payments of $500 per month.

79.     The agreement also required the Muellers to pay, and they did pay, monthly payments of $1,500 to lease equipment.

80.     Additionally, the Muellers made multiple payments to Braintellect for supplies or equipment.

81.     Ms. Mueller worked hard to make her business a success, putting in nearly a year-and-a-half of hers and her husband's time and effort.

82.     The Muellers invested more than $50,000 in their business, including license payments, payments to Braintellect, commercial rent, and other business expenses.

83.     Over the year-and-a-half, their business income was less than Can$16,000.

84.     The Muellers terminated their "license" in September 2014.

85.     Had Ms. Mueller known the near-zero possibility of realizing a profit from the "license," she never would have entered into the agreements, and would not have paid the initial payment, the ongoing monthly fees, or the additional fees.

86.     Ms. Mueller did not know, and could not have known with reasonable diligence, the facts underlying her claims, including that fact that his Brain State "licenses" never gave her any reasonable probability of operating a successful business. She did not know, and could not have known with reasonable diligence, that her failed business was the result of Brain State's misconduct.

87.     Had Brain State disclosed the facts material to the transactions, Ms. Mueller would not have purchased the Brain State "license" or paid the additional fees.

88.     Ms. Mueller paid Brain State Technologies more than $45,000, none of which she would have paid but for Brain State's misconduct.

89.     Ms. Mueller paid hundreds of dollars to Braintellect, none of which she would have paid but for Brain State's misconduct.

## FRAUD ALLEGATIONS

90.     Because Plaintiffs' claims arise out of Brain State's failure to disclose material facts, there is no one document or communication, and no one interaction, on which Plaintiffs base their claims.  Plaintiffs allege that at all relevant times, including when they entered into agreements, operated their businesses, and made payments to either Brain State Technologies or Braintellect, and extending to the present, that Brain

State was under a duty to disclose that the "licenses" were essentially worthless, and that Brain State never disclosed the relevant material facts to the Plaintiffs as required by law.

91.     Plaintiffs make the following specific fraud allegations to the best of their ability in light of the fact that Brain State is in a superior position to know and possess more specific information relating to its fraudulent conduct, and in the absence of discovery:

        a.     **Who:**  Brain State Technologies, LLC, and Braintellect, LLC failed to disclose the facts material to the "licenses."  Brain State is in position to know which Brain State employees made the decisions to omit material facts and deceptively state that Brain State licenses were not franchises under the FTC Franchise Rule.  Defendant Lee Gerdes signed the licensing agreements and so any statements therein are attributable to him.

        b.     **What**:  Brain State was required by law to disclose, and should have disclosed, the risks and potential gains attendant to operating a Brain State license, including, for example, the disclosures required by the FTC's Franchise Rule and Arizona's business opportunities law, which include, but are not limited to, the nature of the seller and its business operations, the costs to purchase the business opportunity, the contractual terms and conditions under which the business operates, the fees and ongoing expenses related to the operation of the business, the success of the seller and its purchasers, and the seller's financial viability

        c.     **When**:  Brain State had a duty to disclose these material facts, and failed to do so, at all relevant times, including before the Purchasers entered into agreements, when the Purchasers operated their brain assessment businesses, when the Purchasers made payments to Brain State Technologies or to Braintellect, and extending to the present.  Brain State's misconduct was and is an ongoing and continuous pattern and practice of fraud.

d.      **How**:  Brain State omitted and concealed the true nature of the agreements in the agreements themselves, in demands for payment, in marketing materials, and in other communications with Purchasers.

e.      **Why**: Brain State omitted and concealed material information in order to induce Purchasers to pay substantial sums of money for "licenses" and associated payments.

## STATUTES OF LIMITATION TOLLING

92.      **Fraudulent Concealment**: Any applicable statutes of limitation have been tolled by Brain State's knowing and active concealment and omission of material facts, when it had a duty to disclose those facts.

93.      **Estoppel**: Brain State was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Brain State "licenses."  Plaintiffs and Class Members reasonably relied on Brain State's knowing failure to disclose and/or active concealment of those facts.  Brain State is estopped from relying on any statutes of limitation in defense of this action.

94.      **Discovery Rule**: The causes of action did not accrue until Plaintiffs and Class Members discovered, or could have discovered with reasonable diligence, the facts omitted and/or concealed by Brain State.  Plaintiffs and Class Members had no realistic ability to discern the true nature and value of their "licenses."

95.      **Continuing Violations**: Brain State had a continuing duty to disclose all material facts throughout the relevant time period, up to the present.  Brain State never disclosed all material facts, and, to date still has not done so.  Brain State's failure to disclose material facts constitutes a continuing pattern and course of conduct as opposed to unrelated discrete acts.  The entirety of that conduct, as to each Plaintiff Class Member, is a single violation of each of the applicable statutes and common law doctrines. Plaintiffs' and Class Members' claims therefore accrued only on the date of the most recent material omission.

## CLASS ACTION ALLEGATIONS

96.   Plaintiffs bring this action on behalf of themselves and, under Fed. R. Civ. P. 23(a) and (b)(3), as representatives of the Class defined as follows:

> All individuals or business who entered into "licensing" agreements with Brain State Technologies, LLC., or made payments in connection with those agreements to Brain State Technologies, LLC, Braintellect LLC, or any related person or entity.

97.   Plaintiffs also bring this action on behalf of themselves and, under Fed. R. Civ. P.  23(a) at (b)(3), as representatives of Subclass defined as follows:

> All individuals or business who, on or after August 2, 2012, entered into "licensing" agreements with Brain State Technologies, LLC., or made payments in connection with those agreements to Brain State Technologies, LLC, Braintellect LLC, or any related person or entity.

Excluded from the Class and Subclass are Defendants and their subsidiaries and affiliates, as well as the judicial officers and their staff to whom this case is assigned or referred, and their immediate family members.

98.    The members of the Class and Subclass are so numerous that joinder is impracticable because there are, on information and belief, around 200 active Brain State Purchasers, and an unknown number of former Purchasers.

99.    This case presents numerous questions of law or fact that are common to all Class members.  These questions' answers are central to the validity of Plaintiff's and Class members' claims, and their determination is apt to drive the resolution of the claims. These common questions include:

a.    Whether Brain State failed to disclose material facts when selling Brain State "licenses" and demanding payments from Purchasers;

b.    Whether Brain State's sale of "licenses" without disclosing material information violated the Arizona Consumer Fraud Act;

c.    Whether Brain State's sale of "licenses" without disclosing material facts constituted common law fraud;

d.    Whether Brain State's sale of "licenses" without disclosing material facts unjustly enriched Brain State;

1    e.    Whether Brain State's "licenses" are "business opportunities" under

2 Arizona's business opportunities law;

3    f.    Whether Brain State is a "seller" of a "business opportunity" under

4 Arizona's business opportunities law;

5    g.    Whether Brain State complied with the registration and disclosure

6 requirements of Arizona's business opportunities law;

7    h.    Whether Class Members are entitled to a rescission of their

8 agreements and refund of moneys paid to Brain State;

9    i.    Whether Brain State Technologies, LLC and Braintellect, LLC,

10 independently or together constitute an "enterprise" for the purposes of RICO;

11    j.    Whether Brain State transmitted agreements, demands for payments,

12 and other materials related to the "licensing" scheme by means of mail and wire

13 communications travelling in interstate or foreign commerce;

14    k.    Whether Brain State's transmitting agreements, demands for

15 payments, and other Brain State materials, and virtual monitoring of Purchaser buisnesses

16 constituted mail or wire fraud;

17    l.    Whether Defendants controlled and participated in the activities of

18 the two Brain State corporate entities, which together constitute the Brain State RICO

19 Enterprise;

20    m.    Whether Gerdes controlled and participated in the activities of the

21 two Brain State corporate entities, each of which constitutes a RICO enterprise;

22    n.    Whether Defendants conducted and participated in the affairs of a

23 RICO enterprise through a pattern of racketeering activity;

24    o.    Whether Class members are entitled to damages, either through the

25 Arizona Consumer Fraud Act or RICO;

26    100.    Plaintiffs' claims are typical of the claims of those of Class members, as

27 they all arise from the same common course of conduct on the part of Defendants.

28

101.    Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs' interests are aligned with and not in conflict with those of Class members. Plaintiffs and the Class are represented by counsel with long and deep experience in the prosecution of consumer class actions, and franchise law.  Plaintiffs' counsel is knowledgeable about the applicable law and possesses the resources to fully commit to representing the Class.

102.    Questions of law or fact common to class members predominate over any questions affecting only individual Class members.

103.    A class action is superior to other available methods for fairly and efficiently adjudicating these claims.

**FIRST CAUSE OF ACTION**
**ARIZONA CONSUMER FRAUD ACT**
**ARIZ REV. STAT. § 44-1521 *ET SEQ.***
**AGAINST ALL DEFENDANTS AND ON BEHALF OF THE CLASS**

104.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

105.    The Arizona Consumer Fraud Act prohibits "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged[.]"  Ariz. Rev. Stat. § 44-1522.

106.    Defendants are "persons" under the Act.

107.    The right to operate a brain harmonization license as well as Brain State's hardware and software are all "merchandise" under the Act.

108.    Brain State's deceptive sales of "licenses" and omission of material facts constitute prohibited acts under the Act.

109.    Brain State sold "licenses" to Plaintiffs and Class Members and made repeated demands for payment without disclosing all material facts.

110.    At all relevant times, up to the present, Brain State had the duty to disclose to Plaintiffs and Class Members all facts material to purchasing and operation of a Brain State license.

111.    Brain State did not, and to date has not, disclosed all material facts.

112.    Material facts omitted by Defendants include, but are not limited to:

a.    That Plaintiffs and Class Members would be required to pay additional fees to Braintellect to operate their brain assessment businesses;

b.    That the business opportunities were essentially worthless, for Purchasers had no realistic possibility of breaking even, let alone making a reasonable profit;

c.    That Brain State would control or attempt to control Plaintiffs and Class Members in their use of the Brain State technology;

d.    That Brain State would impose arbitrary rules on Plaintiffs and Class Members;

e.    That Brain State could not sustain its operations without continuous infusions of capital in the form of Purchaser payments; and

f.    That Brain State intended to and would compete directly and aggressively with Plaintiffs and Class Members.

113.    Brain State knew or should have known the material facts it failed to disclose.

114.    Plaintiffs and the proposed Class were harmed by Brain State's violations of the Act because they would not have paid fees and other costs to Brain State but for the material misrepresentations and omissions.

115.    Plaintiffs, on behalf of themselves and the proposed Class, seek damages, rescission, and restitution.

1

2

**SECOND CAUSE OF ACTION**
**COMMON LAW FRAUD**
**AGAINST ALL DEFENDANTS AND ON BEHALF OF THE CLASS**

3       116.    Plaintiffs repeat and incorporate by reference each of the foregoing

4   allegations of this Complaint.

5       117.    Brain State sold "licenses" to Plaintiffs and Class Members and made

6   repeated demands for payment without disclosing all material facts.

7       118.    At all relevant times, up to the present, Brain State had the duty to disclose

8   to Purchasers all facts material to purchasing and operation of a Brain State "license."

9       119.    Brain State did not, and to date has not, disclosed all material facts.

10      120.    Material facts omitted by Defendants include, but are not limited to:

11          a.      That Plaintiffs and Class Members would be required to pay

12   additional fees to Braintellect to operate their brain assessment businesses;

13          b.      That the business opportunities were essentially worthless, for

14   Purchasers had no realistic possibility of breaking even, let alone making a reasonable

15   profit;

16          c.      That Brain State would control or attempt to control Plaintiffs and

17   Class Members in their use of the Brain State technology;

18          d.      That Brain State would impose arbitrary rules on Plaintiffs and Class

19   Members;

20          e.      That Brain State's products were potentially illegal under laws

21   regulated health care products;

22          f.      That Brain State could not sustain its operations without continuous

23   infusions of capital in the form of Purchaser payments; and

24          g.      That Brain State intended to and would compete directly and

25   aggressively with Plaintiffs and Class Members.

26      121.    Brain State knew or should have known the material facts it failed to

27   disclose.

28

1    122.   Brain State intended that Plaintiffs and Class Members would rely on its

2    material omissions by paying money to Brain State for the right to purchase and operate a

3    Brain State license.

4    123.   Plaintiffs and Class Members had the right to rely on Brain State's

5    representations and omissions in purchasing Brain State licenses.

6    124.   Plaintiffs and Class Members did so rely on Brain State's material

7    omissions by paying money for the right to purchase and operate Brain State licenses.

8    125.   Plaintiffs and Class Members were harmed by Brain State's violations of the

9    Act because they would not have paid fees and other costs to Brain State but for the

10    material misrepresentations and omissions.

11    126.   Plaintiffs, on behalf of themselves and the proposed Class, seek damages,

12    rescission, and restitution.

13                           **THIRD CAUSE OF ACTION**
                              **UNJUST ENRICHMENT**
14    **AGAINST ALL DEFENDANTS AND ON BEHALF OF THE CLASS**

15    127.   Plaintiffs repeat and incorporate by reference each of the foregoing

16    allegations of this Complaint.

17    128.   Plaintiffs and Class Members conferred benefits upon Brain State in the

18    form of initial and recurring payments for the operation of licenses, and payments to Brain

19    State Technologies, LLC, and to Braintellect, LLC for miscellaneous supplies and

20    equipment.

21    129.   Those payments were made with the reasonable expectation that Brain State

22    licenses presented any reasonable likelihood that Plaintiffs and Class Members could

23    recoup their investments and run profitable businesses.

24    130.   It would be unjust to permit Brain State to keep the payments made by

25    Plaintiffs and Class Members because Brain State induced Plaintiffs and Class Members

26    to make those payments by failing to disclose the facts material to the transactions.

27    131.   Plaintiffs, on behalf of themselves and the proposed Class, seek restitution.

28

**FOURTH CAUSE OF ACTION**
**ARIZONA BUSINESS OPPORTUNITY LAW**
**ARIZ. REV. STAT. § 44-1271 *ET SEQ*.**
**AGAINST ALL DEFENDANTS AND ON BEHALF OF THE SUBCLASS**

132.     The Fourth Cause of Action is pleaded in the alternative to the First, Second, and Third Causes of Action.

133.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

134.     On August 2, 2012, Arizona enacted a law requiring anyone who sells or leases a "business opportunity" costing $500 or more to register with the State and make certain written disclosures before the sale.  Ariz. Rev. Stat. §§ 44-1271(1)(a), 44-1271.01, 44-1276.

135.     The definition of a "business opportunity" does not include "[t]he sale of a franchise as defined by the" FTC Amended Franchise Rule.  *Id.* § 44-1271(1)(c)(iii).

136.     Defendants are "sellers" and Brain State "licenses" are "business opportunities," both as defined by the Arizona law.

137.     Because the agreements, drafted by Defendants, state that Brain State licenses are not franchises as defined by the FTC rules, Defendants are estopped from claiming that the "licenses" are not business opportunities under the Arizona business opportunity law.

138.     Brain State did not comply with the registration and disclosure requirements of the Arizona law.

139.     Under the statute, "[n]o  . . . sale of a business opportunity or merchandise related to a business opportunity is effective unless" the seller makes certain disclosures.  *Id.* § 44-1276(D).

140.     Moreover, "[a] consumer may rescind a sale by an unregistered seller at any time" and "[recover] any purchase monies paid to the unregistered sellers, financial damages caused by the unregistered seller and reasonable attorney fees and costs."  *Id.* § 44-1279.

141.    Plaintiffs, on behalf of themselves and the proposed Subclass, seek rescission of the agreements, restitution of all monies paid to Brain State, attorneys' fees, and costs.

**FIFTH CAUSE OF ACTION**
**RACKETEER INFLUENCED AND CORRUPT PRACTICES ACT**
**18 U.S.C. § 1961 *ET SEQ*.**
**AGAINST ALL DEFENDANTS AND ON BEHALF OF THE CLASS**

142.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

143.    RICO prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering.  18 U.S.C. § 1692(c).

144.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

145.    Defendants Brain State Technologies, LLC and Braintellect, LLC together constitute an "association-in-fact" enterprise within the meaning of RICO, and will be referred to as the Brain State RICO Enterprise.

146.    The Brain State RICO Enterprise, which engaged in, and whose activities affected, interstate and foreign commerce, is an association-in-fact of corporate entities within the meaning of 18 U.S.C. § 1961(4).  The Brain State RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

147.    The Brain State RICO Enterprise had a common purpose: to sell Brain State "licenses" that they could not have sold, and for greater amounts than they otherwise could have recouped, and to receive additional fees they otherwise could not have received, had the material facts relevant to the transactions been disclosed.

148.    At all relevant times, the Brain State RICO Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

149.    At all relevant times, Defendants operated, controlled, or managed the Brain State RICO Enterprise, and profited from the Brain State RICO Enterprise.

150.    Defendants conducted and participated in the conduct of the affairs of the Brain State RICO Enterprise through a pattern of racketeering activity, beginning at the latest in 2008, and continuing to this day, consisting of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

151.    At all relevant times, Defendants conducted the affairs of the Brain State RICO Enterprise with the common purpose of, among other things: (i) creating and perpetuating the artifice that a Brain State license had any reasonable potential to result in a profitable business and (ii) inducing Purchasers to pay, collectively, millions of dollars to benefit Brain State Technologies, LLC, Braintellect, LLC, and, ultimately, Gerdes, the founder, owner, and CEO of both entities.

152.    Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communications travelling in interstate or foreign commerce, writing(s), and/or signal(s), including the Brain State websites, the agreements themselves, Brain State hardware, software, and other materials, virtual monitoring of Purchaser businesses, and demands for payment.

153.    At all relevant times, Gerdes, as the founder and CEO of the Brain State operation and signer of the Brain State agreements, was responsible for the content of the agreements and the material omissions within.

154.    Brain State Technologies, LLC marketed the "licenses" and was party to the licensing agreements.  Its employees managed relations with Purchasers, monitored their businesses, and collected payments on behalf of Brain State Technologies.  Brain State Technologies is in position to know which employees committed acts in furtherance of the scheme.

155.    Braintellect, LLC's role in the racketeering scheme was to collect payments for supplies and other miscellaneous expenses necessary for Purchasers to operate their

businesses.  Braintellect is in position to know which employees committed acts in furtherance of the scheme.

156.    Each of the agreements, other materials, and demands for payment sent by Brain State to Plaintiffs and members of the Class constituted an act of mail or wire fraud, because they were transmitted, by means of mail and wire communications travelling in interstate or foreign commerce, writings or signals, and were part of a scheme to defraud Plaintiffs and members of the Class.

157.    For example, Brain State's transmittal of Plaintiff Nelson's initial agreement, subsequent agreement, monthly demands for payment, demands for payments to Braintellect, LLC, and other materials each constituted mail or wire fraud because they were transmitted by means of mail and wire communications travelling in interstate or foreign commerce, and were all instrumental parts of the scheme to induce Nelson to pay money towards an phony investment.

158.    These acts of racketeering spanned at least seven years and are not isolated or long-ago completed events.  There are more than 200 active Brain State licensees and countless former licensees.  Together, these Purchasers have paid millions or tens of millions of dollars to Brain State and, ultimately, to Gerdes.

159.    Moreover, like Plaintiffs, each individual Purchaser was obligated to make continuing, monthly payments to Brain State Technologies, LLC.  And also like Plaintiffs, many or most Purchasers also made payments to Braintellect, LLC.

160.    These acts also present a threat of continued racketeering activity for the more than 200 active Purchasers currently making payments to Brain State.

161.    As a result of Defendants' actions, Plaintiffs and members of the Class were injured in their business or property because they paid money they otherwise would not have paid.

162.    Plaintiffs seek treble damages, attorneys' fees, and costs.

**SIXTH CAUSE OF ACTION**
**RACKETEER INFLUENCED AND CORRUPT PRACTICES ACT**
**18 U.S.C. § 1961 *ET SEQ.***
**AGAINST DEFENDANT LEE GERDES AND ON BEHALF OF THE CLASS**

163.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

164.    RICO prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering.  18 U.S.C. § 1692(c).

165.    Defendant Lee Gerdes is a "person" within the meaning of 18 U.S.C. § 1961(3).

166.    Defendants Brain State Technologies, LLC and Braintellect, LLC, both corporate entities, each constitute an enterprise within the meaning of RICO.

167.    Brain State Technologies, LLC and Braintellect, LLC engaged in, and their activities affected, interstate and foreign commerce.  Brain State Technologies, LLC and Braintellect, LLC were ongoing organizations with ascertainable structures.

168.    Brain State Technologies, LLC and Braintellect, LLC both had a common purpose: to sell Brain State "licenses" that they could not have sold, and for greater amounts than they otherwise could have recouped, and to receive additional fees they otherwise could not have received, had the material facts relevant to the transactions been disclosed.

169.    At all relevant times, Lee Gerdes operated, controlled, or managed Brain State Technologies, LLC and Braintellect, LLC, and profited from the operation of both enterprises.

170.    Gerdes conducted and participated in the conduct of the affairs of Brain State Technologies, LLC and Braintellect, LLC through a pattern of racketeering activity, beginning at the latest in 2008, and continuing to this day, consisting of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

171.     At all relevant times, Gerdes conducted the affairs of Brain State Technologies, LLC and Braintellect, LLC with the common purpose of, among other things: (i) creating and perpetuating the artifice that a Brain State license had any reasonable potential to result in a profitable business and (ii) inducing Purchasers to pay, collectively, millions of dollars to benefit Brain State Technologies, LLC, Braintellect, LLC, and, ultimately, Gerdes, the founder, owner, and CEO of both entities.

172.     Gerdes devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communications travelling in interstate or foreign commerce, writing(s), and/or signal(s), including the Brain State websites, the agreements themselves, Brain State hardware, software, and other materials, virtual monitoring of Purchaser businesses, and demands for payment.

173.     At all relevant times, Gerdes, as the founder and CEO of the Brain State operation and signer of the Brain State agreements, was responsible for the content of the agreements and the material omissions within.

174.     Each of the agreements, other materials, and demands for payment sent by Brain State to Plaintiffs and members of the Class constituted an act of mail or wire fraud, because they were transmitted, by means of mail and wire communications travelling in interstate or foreign commerce, writings or signals, and were part of a scheme to defraud Plaintiffs and members of the Class.

175.     For example, Brain State's transmittal of Plaintiff Nelson's initial agreement, subsequent agreement, monthly demands for payment, demands for payments to Braintellect, LLC, and other materials each constituted mail or wire fraud because they were transmitted by means of mail and wire communications travelling in interstate or foreign commerce, and were all instrumental parts of the scheme to induce Nelson to pay money towards an phony investment.

176.     These acts of racketeering spanned at least seven years and are not isolated or long-ago completed events.  There are more than 200 active Brain State licensees and

1   countless former licensees.  Together, these Purchasers have paid millions or tens of

2   millions of dollars to Brain State and, ultimately, to Gerdes.

3        177.    Moreover, like Plaintiffs, each individual Purchaser was obligated to make

4   continuing, monthly payments to Brain State Technologies, LLC.  And also like Plaintiffs,

5   many or most Purchasers also made payments to Braintellect, LLC.

6        178.    These acts also present a threat of continued racketeering activity for the

7   more than 200 active Purchasers currently making payments to Brain State.

8        179.    As a result of Gerdes's actions, Plaintiffs and members of the Class were

9   injured in their business or property because they paid money they otherwise would not

10  have paid.

11       180.    Plaintiffs seek treble damages, attorneys' fees, and costs.

12                        **PRAYER FOR RELIEF**

13       **WHEREFORE**, Plaintiffs pray for relief as follows:

14       1.      This action to be certified as a class action on behalf of the proposed

15  Class and/or Subclass; that the named Plaintiffs be appointed as Class Representatives;

16  and that counsel below be designed Class Counsel;

17       2.      Judgment to be entered against all Defendants on all causes of action and

18  damages suffered;

19       3.      Plaintiffs, the Class, and the Subclass be awarded the full, fair, and

20  complete recovery for all causes of action and damages suffered;

21       4.      Plaintiffs, the Class, and the Subclass be awarded rescission, damages,

22  treble damages, punitive damages, restitution, attorneys' fees, and costs.

23       5.      Plaintiffs, the Class, and the Subclass be awarded all appropriate costs,

24  fees, expenses, and pre-judgment and post-judgment interest, as authorized by law;

25  and

26       6.      Such other relief that the Court deems just and proper.

27                         **JURY TRIAL DEMAND**

28       Plaintiffs request a jury trial on all questions of fact raised by this Complaint.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: October 28, 2016

Respectfully submitted,

By: _____
    Mark P. Chalos

Benjamin J. Miller (*pro hac vice*)
HIGGINS FIRM PLLC
524 4th Ave. S.
Nashville, TN 37210
Telephone:  (615) 353-0930
Facsimile:  (888) 210-5883
E-mail:  ben@higginsfirm.com

Jonathan D. Selbin (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York  10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592
E-mail: jselbin@lchb.com

Mark P. Chalos (*pro hac vice*)
Andrew R. Kaufman (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
150 Fourth Avenue North, Suite 1650
Nashville, Tennessee 37219
Telephone:  (615) 313-9000
Facsimile:  (615) 313-9965
E-mail: mchalos@lchb.com
E-mail: akaufman@lchb.com

Roland W. Baggott III (*pro hac vice*)
BAGGOTT LAW, PLLC
4525 Harding Pike, Suite 105
Nashville, TN 37205
Telephone:  (615) 620-4580
Facsimile:  (615) 620-4581
E-mail:  roland@baggottlaw.com

1

Curt Clausen (AZ Bar No. 019709)
Michael Stark (AZ Bar No. 005040)

2

CLAUSEN & WILLIAMSON, PLLC
2999 North 44th Street, Suite 318

3

Phoenix, AZ 85018
Telephone:  (602) 285-4450

4

Facsimile:  (602) 285-4473
E-mail:  curt@cwazlaw.com

5

E-mail:  michael@cwazlaw.com

6

*Attorneys for Plaintiffs and the Proposed Class*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 31 -

THIRD AMENDED CLASS ACTION COMPLAINT